IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

FADIL SALIM SALIH,

                              Plaintiff,

                vs.

MICHAEL J. ASTRUE, Commissioner of
the Social Security Administration;

                              Defendant.

**4:11CV3218**

**MEMORANDUM AND ORDER**

Plaintiff Fadil Salim Salih ("Salih"), seeks review of a decision by the defendant, Michael J. Astrue, the Commissioner of the Social Security Administration ("Commissioner"), denying his application for disability benefits and payment of disability insurance benefits under Title II and Title XVI of the Social Security Act. (TR 126-29, 133-38).  After carefully reviewing the record, the Commissioner's decision will be affirmed.

## I.  PROCEDURAL BACKGROUND

Salih applied for social security disability benefits on July 10, 2008, (TR 126-138), claiming low back injuries rendered him disabled and unable to work since December 12, 2007.  Social Security Transcript ("TR") at 38,.  His application for disability benefits was denied initially on September 4, 2008, (TR 75-78), and upon reconsideration on October 15, 2008.  (TR 80-83).

Salih filed a hearing request on December 9, 2008.  (TR 11-12, 86-87).  A hearing was held before an Administrative Law Judge  ("ALJ") on April 6, 2010.  (TR 33-68).  Salih was represented by counsel at the hearing.  (TR 11-14, 84).  Testimony was received from Salih, and from a vocational expert ("VE") who appeared at the ALJ's request.  (TR 96-97, 113).  In addition to the back problems identified in the plaintiff's

application, the ALJ heard and considered testimony regarding plaintiff's complaints of stomach and hip pain.  (TR 22-40, 300-407).

The ALJ's adverse decision was issued on July 13, 2010, (TR 16-32), and Salih's request for reconsideration by the Appeals Council was denied on October 5, 2011.  (TR 1-3).  Salih's pending complaint for judicial review and reversal of the Commissioner's decision was timely filed on November 30, 2011.  Filing No. 1.

## II.  THE ALJ'S DECISION.

The ALJ evaluated Salih's' claims through all five steps of the sequential analysis prescribed by 20 C.F.R. §§ 404.1520 and 416.920.   TR 18-33.   As reflected in his decision, the ALJ made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

2.      The claimant has not engaged in substantial gainful activity since December 12, 2007, the alleged onset date.

3.      The claimant has the following severe impairments: degenerative disc disease of the lumbar spine; and chronic right lower lumbar pain; and chronic right hip pain.

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant, when provided the opportunity of normal breaks in the mid-morning, lunch time and mid-afternoon, has the residual functional capacity to: lift twenty pounds occasionally and ten pounds frequently: stand for six hours in an eight hour workday: sit for six hours of an eight hour workday: and walk on a frequent basis. Salih is limited to performing only occasional

2

activities of bending, stooping or kneeling. He must not be exposed to concentrated cold temperature extremes or wetness. He has no limitations with regards to the use of his extremities, performing overhead reaching or the ability to climb stairs.

6.      The claimant is capable of performing past relevant work as a production assembler (light, unskilled, SVP 2, DOT 706.687-010) and as a cashier II (light, unskilled, SVP 2, DOT 211.462-010). Work at these jobs does not require the performance of work-related activities precluded by the claimant's residual functional capacity.

7.      The claimant has not been under a disability, as defined in the Social Security Act, from December 12, 2007 through the date of the ALJ's decision (July 13, 2010).

(TR 21-28).


## III   ISSUES RAISED FOR JUDICIAL REVIEW.


Salih claims the ALJ's determination must be reversed because:

1.      Salih's actual job history was not correctly described and analyzed, and the VE's opinions, which relied on this  incorrect identification of Salih's past relevant work, cannot provide a basis for denying Salih's claim.

2.      The jobs named by the VE as providing a basis for denying Salih's claim lie beyond the RFC as found by the ALJ, or were identified in response to a legally defective hypothetical question posed by the ALJ;

3.      The ALJ's credibility finding was not supported by substantial evidence and rests in part upon the use of an incorrect legal standard;

4.      The vocational testimony responded to a hypothetical question which did not include all documented impairments; and

5.      The RFC determination is not supported by substantial evidence.

(Filing No. 18, at CM/ECF pp. 2-3).

3

IV.   THE RECORD AND PROCEEDINGS BEFORE THE ALJ.

The plaintiff is an adult male who came to the United States from Iraq in 1992. Salih attended high school and two years of technical school in Iraq before entering the United States.   (TR 39, 70, 173).   He can speak, read, and write English, and can correctly exchange American money when conducting financial transactions.  (TR 39, 70, 168).   Between 1992 and his injury in 2007, the plaintiff worked as a cashier, a production assembler, a general laborer, a hand packager, and an industrial truck operator.  (TR 39, 144-48, 168-185, 221, 236).

On December 12, 2007, Salih injured his low back and right hip when he stumbled and fell while working as a stocker for his employer, Tecumseh Poultry, LLC.  (TR 152-53).   Following the accident, he was seen and treated by Dr. Stephen J Haudrich, at Concentra Medical Centers.   During the examination, Salih was able to flex his lumbar spine to 90 degrees with only mild pain, extend to 20 degrees, and had a negative bilateral leg raise, a normal gait, symmetric reflexes, and no palpable spasm, sciatic notch tenderness at either buttock, or tenderness at the sacroiliac (SI)  joints.  (TR 250).  Salih was diagnosed as having a lumbar sprain.  He was offered a prescription for ibuprofen, but refused because it was "too strong."  Salih was released to return to work the next day with the following restrictions:  No repetitive lifting of over 20 pounds, and no pushing and/or pulling with over 40 pounds of force.  (TR 242, 249-50).

Salih began physical therapy, (TR 252), with follow up doctor's appointments scheduled for December 17 and December 26, 2007.  (TR 242-43).  After two physical therapy treatments, Salih reported that his back was better, but still sore--possibly from sleeping on the floor to alleviate his back pain.  He was ready to try sleeping in a bed again.  (TR 255).  Salih was discharged from physical therapy on December 17, 2007

with instructions for home exercises.  (TR 256-58).  Salih stopped working on December 19, 2007, reportedly due to pain.  (TR 267, 281).

At his doctor's appointment on December 26, 2007, Salih complained that his symptoms were getting worse.  (TR 259).  Dr. Haudrich referred Salih back to physical therapy, (TR 261), and released Salih to return to work with the following additional restrictions:  No prolonged standing and/or walking longer than one hour per shift and no bending.  (TR 244).  His doctor's appointment was scheduled for December 31, 2007. (TR 235).

When Salih attended physical therapy on December 31, 2007, he was "upset with his employer for what he views as not letting him use his sick days," and stated he would "refuse any work for January," and would "wait and see about returning to work in February."  (TR 265).  Salih's effort at the physical therapy session that day was "[q]uestionable," with his subjective report of symptoms "inconsistent with objective findings."  (TR 266).

> Dr. Haudrich's medical examination, performed on December 31, 2007, revealed:
>
> Negative bilateral leg raise.  Spasm of the paraspinous muscles only on the right today, No tenderness at the sacroiliac joints.   No sciatic notch tenderness at either buttock. Negative Waddell tenderness. Negative Waddell overreaction.

(TR 267).  The x-rays taken that day revealed early degenerative disc disease at L2-3, but no evidence of a compression fracture.  (TR 246).  The plaintiff was allowed to return to work with the following restrictions:  No repetitive lifting over 20 pounds, no prolonged standing or walking longer than one hour per shift, no pushing or pulling over 40 pounds, and no bending.  (TR 247).

After conferring with the physical therapist, Dr. Haudrich discontinued the prescribed physical therapy, explaining:  "I see no need to prolong formal therapy at this time, as it is not helping"  (TR 267).   Salih was referred to a specialist for further treatment.  (TR 247).

Dr. Benjamin Gelber, a neurosurgeon, saw the plaintiff on January 8, 2008.  After performing an examination, Dr. Gelber concluded "[t]his is probably a muscle and ligamentous injury. I do not see anything to suggest lumbar radiculopathy."  (TR 281). Dr. Gelber prescribed Flexeril and Naprosyn and ordered a Magnetic Resonance Imaging (MRI).  The MRI scan of the lumbar spine, conducted on January 9, 2008, showed some minor degenerative changes, but no sign of disc protrusion or extrusion, and no nerve root problems.  (TR 278, 284).

Salih was again seen by Dr. Haudrich on January 30, 2008.  Salih stated his pain was "getting worse to the point he cried with pain 2 days ago,". . "could not walk that day or sleep," and the "pain feels 'hot' at times," radiating down the right leg, particularly at his right buttock," with "some upper back muscle pain between his shoulder blades."  (TR 269).  He claimed the symptoms had been ongoing for the last six day.  But his January 30, 2008 examination revealed:

> Negative bilateral leg raise. Normal FROM. Normal gait. Reflexes symmetric. No sciatic notch tenderness at either buttock. No tenderness at the sacroiliac joints. No point tenderness, No spinous tenderness. No palpable spasm.

(TR 269).  Dr. Haudrich concluded:

> Despite thorough evaluation(s) and imaging, we have not been able to identify any acute anatomical explanation for his symptoms.  I explained that he has had imaging of all areas of concern to him, both with plain films and MRI.  He has failed physical therapy.  He is less able/willing to walk on a treadmill than while walking normally down our halls.  We can find no

> objective evidence of a significant Injury on exam.  Any muscular strain
> should have resolved by 6 weeks out from the injury, even without
> intervention.  I can identify nothing to prevent him from working regularly
> relative to his injury of 12/12/2007.  For the chronic degenerative changes
> seen on his MRI, which pre-exist his injury and are not work-related, he is
> to see a personal physician of his choice. He is at MMI today.

(TR 270).  Salih was released by Dr. Haudrich to return to his regular duties, with no
restrictions, on January 30, 2008.  (TR 248).

On March 14, 2008, Dr. Rajesh Kumar, an orthopedic doctor, performed an
independent medical examination of the plaintiff.   (TR 290).   Salih was able to
communicate with Dr. Kumar in English.  (TR 290). Dr. Kumar noted that Salih "walks
with a stiff gait, trying to hold on to his right hip."  (TR 290).  The spinal examination
revealed a muscle spasm in the right lumbar muscles, with tenderness in the lumbosacral
areas radiating into the right side.  Salih complained of some pain in the upper lumbar
area. (TR 290).  Dr. Kumar diagnosed:  "Back sprain, probable injury to L4-5 and L5-S1
disks and the ligaments surrounding that area," and noted that Mr. Salih "has difficulty
standing and walking" (Tr. 291). Dr. Kumar concluded:

> At present [Salih] cannot do any pulling, pushing or lifting. He is limited to
> standing or sitting in one place for half an hour."  In the future, he will
> require medical treatment as well as physiotherapy. If his symptoms get
> worse, one may have to consider surgical treatment as well.

(Tr. 291).

A second independent medical examination, with a medical records review, was
performed by Dr. Michael O'Neil, an orthopedic doctor, on June 2, 2008.  Dr. O'Neil
concluded Salih's pain was focused on the right SI joint of his hip, Salih had not yet
reached maximum medical improvement, and he could benefit from steroid injections
and a right SI joint stabilizing program.  Dr. O'Neil did not place any restrictions on the
plaintiff's ability to work.  (TR 297-98).

7

Dr. Kumar saw Salih again on August 27, 2008, and concluded the plaintiff had reached maximum medical improvement, and due to a back sprain and probable lower lumbar disc injury, had a limited ability to stand, walk, pull, push, or lift. (TR 302).

On September 2, 2008, Salih was seen by Dr. Geoffrey McCullen for a second treatment opinion.  Dr. McCullen diagnosed right-sided low back pain of uncertain etiology.  Like Dr. Gelber, Dr. McCullen did not believe surgery was indicated  He referred Salih to Dr. David Diamant for pain treatment.  (TR 325).

The following day, Dr. Jerry Reed performed a Physical Residual Functional Capacity Assessment, (RFC).  Dr. Reed concluded the plaintiff had no visual, auditory, or speech  limitations, no limitations on the use of his hands, and no environmental limitations other than avoiding concentrated exposure to vibration and extreme cold.  He further found that Salih was able to:

- occasionally lift and/or carry 20 pounds, and frequently lift 10 pounds;

- stand, walk, or sit six hours in an eight-hour day;

- frequently balance or kneel; and

- frequently climb steps, and occasionally use ladders or scaffolds, stoop, crouch, and crawl;

(TR 305-09).  Dr. Reed considered the plaintiff's complaints only "partially credible," explaining:

> He was able to stand on his toes and on his heels. He was able to lie down and sit up from a lying position. Peripheral circulations were normal. Previous x rays referenced showing normal alignment of the spine. MRI was also referenced showing no spinal stenosis, no disc protrusion and only disc bulging at L4, 5, S1 and a question of an annular tear.  Impression of a back sprain and probable disc injury at L4, 5 and S1. Claimant's conditions are severe but will not M/E any listing. He appears capable of performing work activity as outlined in this RFC.

8

(TR 311).

On September 11, 2008, Dr. Diamant examined the plaintiff.  Salih appeared to be "in no acute distress with a normal gait pattern, [n]o lumbar listing, scoliosis, guarding, or spasm."  The examination showed:

> Forward flexion two-thirds the way down, he does not complain of pain he just says he cannot bend anymore without bending the knees, Extension beyond neutral is full range without pain, Non-tender along the SI joint bilaterally.
>
> While seated, straight leg raise is negative bilaterally.  Strength is normal in knee extension, ankle dorsiflexion, big toe extension, and ankle eversion bilaterally.  Sensation is normal to light touch in the L3 through S1 dermatome bilaterally.  Reflexes are normal at the patella and Achilles tendons bilaterally. 2+ dorsalis pedis pulse bilaterally.
>
> While recumbent, straight leg raise is negative bilaterally.  Moderately tight hamstrings on each side.  Stretching the right hamstring does cause some degree of right hip/back pain, relieved when I relieve the hamstring stretch. Patricks test is negative as is stretching the hip lateral rotators.   While prone, he is tender in the right lower lumbar paraspinals, non-tender on the left.

(TR 321-22).  On September 19, 2008, Dr. Diamant performed a Right L5, S1 facet nerve block for treatment of Salih's complaints of right low lumbar pain.  (TR 320).  Salih reported no pain relief from the nerve block.  (TR 346).  Dr. Diamant referred the plaintiff to chiropractic care, (TR 346), but also concluded Salih remained able to "work at a sedentary to light duty capacity if such were available."  (TR 347).

A second Physical RFC was performed by Dr. Glen Knosp on October 15, 2008. Dr. Knosp affirmed the previous RFC opinions of Dr. Reed.  (TR 343).

Salih began receiving chiropractic care from Dr. David W. Lauer on October 27, 2008.  (TR 365).  As of November 3, 2008, the plaintiff continued to complain of low back pain, rated at between 3 and 4 on a 0-10 scale.  (TR 368).  The plaintiff stated that standing primarily causes hip pain, with some secondary back pain, and he can stand for only a couple of hours at a time and then has to lie down.   At his chiropractic appointment on November 7, 2008, the plaintiff stated his low back pain had improved, but his hip pain remained a problem--especially at night.  (TR 370).  By November 12, 2008, Dr. Lauer believed Salih was not responding appreciably to chiropractic treatment. (TR 371).

Salih saw Dr. Thomas L. Green, a chiropractor, who examined the plaintiff and his medical records.  Dr. Green concluded Salin had a chronic lumbar strain with pain, muscle guarding, and  spasm, and permanent work restrictions were needed. (TR 412). He recommended a Functional Capacity Evaluation (FCE) to determine Salih's specific work limitations.  (TR 412).

An FCE was performed on March 23, 2009.  (TR 400).  "Numerous subjective and objective inconsistencies were seen throughout the assessment," and the FCE results were considered invalid. (TR 400). Due to the invalidity of the FCE findings, the examiner stated the data could not be relied upon for vocational planning. (TR 404).

On March 27, 2009, Dr. Green reported Salih remains able to perform light to medium work, and remains able to:

- Lift 20 pounds occasionally (defined as up to 33% of the workday), and 10 pounds frequently (defined as up to 66% of the workday);

- Sit constantly (defined as up to 100% of the workday), with breaks every two hours;

- Stand and walk frequently, with breaks every two hours;

10

- Reach over his shoulders constantly; and

- Bend, stoop, squat, kneel, and crawl occasionally.

(TR 415-17).

On June 26, 2009, Salih was sought medical treatment for low back and hip pain at the Center for People in Need.  (TR 420).  The Center requested the plaintiff's past medical records for review, and prescribed Meloxicam.  (TR 422).  The plaintiff did not return to the Center until March 1, 2010.  At that time, he complained that during the course of his treatment, he should have seen an orthopedic doctor instead of a spine specialist.   He further complained about receiving only $14,000 for his worker's compensation claim rather than the $100,000 he deserved.   The Center prescribed Meloxicam, Ibuprofen, and Zantac for the plaintiff's symptoms of pain and stomach discomfort.  (TR 422-23).

Although Salih had previously stated he was unable to afford any further attempts at physical therapy for alleviation of his symptoms, (TR 215), even after receiving his worker's compensation settlement in February of 2010, he did not re-attempt physical therapy or seek out any medical treatment except for the treatment received at the Center one month before his hearing before the ALJ.  (TR 61).

At the April 6, 2010 hearing before the ALJ, the plaintiff claimed that needs to lay down every one or two hours due to pain in his hip and low back.  (TR 40, 169).   He described his pain as a stabbing pain; rated a 2 out of 10 during the day, and 4 out of 10 at night.  (TR 51).  He explained  that his pain subsides if he lays down with his hips flexed, (TR 213); and it dissipates to a 1 out of 10 while he takes a hot shower, but it worsens when the weather is cold and when he bends over at the waist.  (TR 52-53, 214).  The plaintiff testified that he needs to sleep on his side at night, (TR 52), and the pain keeps him awake which, in turn, interferes with his ability to focus during the day.  (TR 41). The plaintiff testified that he received a prescription ibuprofen for pain and a medication

to help him sleep, (TR 41-42, 214, 222), which reportedly upset his stomach, (TR 215), and he takes a medication for the stomach symptoms.  (TR 42).

The plaintiff claims he can walk for only 20 minutes, and stand for only one or two hours before he needs to sit or lay down; sit for only one or two hours at a time, for a total of no more than four hours in an eight-hour day; stand for no more than four hours and walk for no more than one or two hours in an eight-hour day.  He claims he can lift no more than 10 pounds with one hand, or 20 pounds with both hands, and cannot bend or twist at the waist without exacerbating his pain.  (TR 53-55; 216-17).  Salih claims he cannot do laundry, but states he is able to perform household chores, drive and attend church, cook, visits friend, shop for groceries, and work in the garden.  He walks for 10-15 minutes every day, and reads up to four hours a day, usually reading religious books or the Arabic/English dictionary. (Tr. 55-58, 187-88, 199, 216-19).

During the hearing, the plaintiff was asked to review exhibit 14E (TR 176-85), a document listing Salih's past jobs and written by Salih himself, and then comment whether he remains able to perform the jobs he had done in the past.  (TR 43-50).  Salih confirmed that the job descriptions listed in exhibit 14E were accurate.  The plaintiff testified that he cannot perform his past relevant work as:

- A cashier, because he needs to lie down every two hours, and must be able to perform some lifting and bending (to fill the refrigerator or to clean and check propane tanks), (TR 43-44, 236);

- A production assembler, because he cannot lift and carry boxes, or bend, stoop, or crouch, (TR 45-47);

- A general laborer, because he has difficulty reaching, walking, bending, and climbing, and he cannot lift more than 20 pounds, climb and stoop, and has balance issues,  (TR 47-48);

12

- A hand packager, because he cannot continuously reach and cannot lift or pull up to 50 pounds, (TR  49); or

- An industrial truck operator, because he cannot reach, climb, crouch, or handle, and he cannot lift more than 20 pounds.  (TR 50)

After listening to the plaintiff's testimony and affording the plaintiff a full opportunity to be heard, the ALJ posed the following hypothetical question to the VE: Assuming someone of the plaintiff's age, education, and past work history should avoid exposure to constant cold and wetness, but is able to lift up to 20 pounds on occasion and 10 pounds on a frequent basis; can sit or stand for six hours in an eight-hour day; has unlimited use of his extremities; and can occasionally bend, stoop, and kneel; can walk on a frequent basis, and can reach above the head and climb stairs with no difficulties, could that person perform the plaintiff's past relevant work in a job with normal mid-morning and mid-afternoon breaks?  (TR 64-65).  The VE testified that Salih could still perform his past relevant work as a cashier II and as a production assembler, but was no longer able to be a general laborer, a hand packager (at the medium exertional level), or an industrial truck operator.  The VE further testified that Salih remains able to perform other types of jobs in the regional and national economy, including the job of a hand packager at the light exertional level, with 14,448 such jobs in the Iowa, Nebraska, Missouri, and Kansas region, (TR 65-66); or a housekeeping cleaner, with 17,783 such jobs in the four-state region and 376,362 jobs nationally.

The VE further testifies that no jobs are available in the national competitive labor market if the plaintiff needs to lay down after lunch for two hours, (TR 66); or if, as plaintiff states, he needs to lay down every two hours, can lift no more that 10 pounds with one hand and 20 pounds with both hands; has difficulty bending, and twisting, and can sit or stand for only one to two hours, and walk for only 20 minutes. (TR 66-67).

# V.   ANALYSIS

Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II, which in this case is the ALJ's decision.   A denial of benefits by the Commissioner is reviewed to determine whether the denial is supported by substantial evidence on the record as a whole.   Hogan v. Apfel, 239 F.3d 958, 960 (8th Cir. 2001).

> If substantial evidence on the record as a whole supports the Commissioner's decision, it must be affirmed.   Choate v. Barnhart, 457 F.3d 865, 869 (8th Cir. 2006).   "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'"   Smith v. Barnhart, 435 F.3d 926, 930 (8th Cir. 2006) (quoting Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)). "The ALJ is in the best position to gauge the credibility of testimony and is granted deference in that regard."   Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002).

Schultz v. Astrue, 479 F.3d 979, 982 (8th Cir. 2007).   Evidence that both supports and detracts from the Commissioner's decision must be considered, but the decision may not be reversed merely because substantial evidence supports a contrary outcome.   Id.   See also, Moad v. Massanari, 260 F.3d 887, 890 (8th Cir. 2001).   In other words, "a position can be justified even though it is not correct."   Pierce v. Underwood,  487 U.S. 552, 566 n. 2 (1988).

Salih claims the ALJ incorrectly assessed the plaintiff's credibility, resulting in an inaccurate and unsupported determination of the plaintiff's RFC.   He further claims the VE failed to properly consider Salih's actual past work experience, the VE's identification of jobs consistent with that past work experience were therefore incorrect,

14

and even assuming they were correct, the physical requirements of the jobs identified exceed the plaintiff's RFC.

A.      Determination of the Plaintiff's RFC.

The ALJ must determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his limitations. Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005); Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir.1995). Before the ALJ determines an applicant's RFC, "the ALJ must determine the applicant's credibility, as his subjective complaints play a role in assessing his RFC." Ellis v. Barnhart, 392 F.3d 988, 995-96 (8th Cir. 2005). See also Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001) ("Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility.").

1.      Credibility Assessment.

"If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination." Renstrom v. Astrue, 680 F.3d 1057, 1065-66 (8th Cir. 2012). Polaski v. Heckler, 739 F.2d 1320 (8th Cir.1984), outlined the following factors  to be considered when assessing a claimant's credibility:

(1)     the claimant's daily activities;

(2)     the duration, intensity, and frequency of pain;

(3)     the precipitating and aggravating factors;

(4)     the dosage, effectiveness, and side effects of medication;

(5)     any functional restrictions; (6) the claimant's work history; and

15

(7)     the absence of objective medical evidence to support the claimant's complaints.

Id.  The ALJ must make an express credibility determination, explaining the reasons for discounting the claimant's testimony, setting forth the inconsistencies, and discussing the Polaski factors.  Renstrom, 680 F.3d at 1066.  The ALJ is not required to discuss each Polaski factor, so long as the factors are acknowledged and examined before discounting a claimant's subjective complaints.  Renstrom, 680 F.3d at 1067.

As set forth in his opinion, the ALJ found that Salih's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but his "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible."  (TR 23).  The ALJ noted "discrepancies between the claimant's assertions regarding the severity and limitations of his symptoms and accounts in the medical evidence of signs and findings which are inconsistent with the claimant's allegation of disabling impairment."  (TR 23).

The ALJ explained that the objective findings on medical testing are incongruous with the plaintiff's expressed symptoms.  Although the plaintiff was diagnosed with degenerative disc disease, including lumbar spondylosis at L4-LS and L5-S1 and a possible annular tear at L4-L5, the MRI revealed no thecal sac or root compression, and no foraminal narrowing, and the plaintiff was not complaining of radicular pain or parathesias.  (TR 23).  Instead, Salih complained of pain in his right hip.  His retain doctors considered SI joint dysfunction as a possible diagnosis, but that was ruled out when, upon examination, Salih exhibited no tenderness at the SI joint, had a negative Faber and Patricks testing, and flexion did not elicit pain.  Physical therapy, a right L5-S1 nerve block, chiropractic care and pain medications had no appreciable impact on the plaintiff's complaints.  Dr. Diamant, a treating physician who fully evaluated Salih's symptoms and possible treatment modalities, could not find either a cause or a remedy.

The doctors agree Salih is not a candidate for surgery and contrary to Salih's assertion, none of them stated Salih must lay down every two hours.  In the end, Salih's treating physician's and chiropractors, along with those performing independent medical evaluations, were unable to explain the pain pattern and source of the plaintiff's stated symptomology, much less the extent of his complaints.

Although an ALJ cannot discount subjective complaints solely because they are not fully supported by objective medical evidence, those complaints may be discounted based on inconsistencies in the record as a whole.  Ellis v. Barnhart, 392 F.3d 988, 996 (8th Cir. 2005).   The ALJ's summary of the inconsistencies between his subjective complaints and the objective findings, or lack of thereof, is fully supported by the record and, in turn, supports his conclusion that Salih was not fully credible.  Id. (affirming the ALJ's credibility finding where the plaintiff claimed that back and hip pain were severe enough to prevent him from sitting or standing for any length of time, but the medical examination revealed normal, or near normal, range of motion in his shoulders, hips, cervical spine, and lumbar spine).

The ALJ also considered Salih's willingness to work. As the ALJ's opinion states, Dr. Diamant released Salih to return to work, and Salih responded by asking for a note stating he was unable to work.  Dr. Diamant refused, stating the plaintiff could perform sedentary to light duty work.  A plaintiff's lack of initiative or disincentive to return to work can support an ALJ's finding that the plaintiff's subjective complaints are not credible.  Renstrom v. Astrue, 680 F.3d 1057, 1067 (8th Cir. 2012) (holding the claimant's work history, and his possible disincentive to return to work because of his worker's compensation litigation, along other inconsistencies in the record as a whole, undermined the claimant's credibility).

Citing to Salih's written statements, the ALJ questioned how the plaintiff could carry out his described daily activities with his complaints of disabling symptoms and limitations. In response to SSA questionnaires, Salih had stated that he reads books two to four hours a day and watches television two hours a day; can clean, cook, sew, play cards, and garden; goes to the store daily, to church twice a week and to the park; and he can climb stairs and drive. "[A]cts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain." Medhaug v. Astrue, 578 F.3d 805, 817 (8th Cir. 2009).

The ALJ further noted that Salih has not taken, nor been prescribed, any narcotic based pain relieving medications despite his complaints of severe pain, and that he originally rejected pain medications as too strong. The ALJ commented that Salih's alleged side effect from pain medications, an upset stomach, would not have significantly interfered with his ability to work. Evidence that a claimant did not regularly require prescription medication or participate in physical therapy to alleviate symptoms of pain can create doubt in a reasonable adjudicator's mind regarding the veracity of the subjective complaints. Curran-Kicksey v. Barnhart, 315 F.3d 964, 969 (8th Cir. 2003).

The ALJ discussed many Polaski factors in discrediting Salih's credibility and explained his reasoning, all of which is fully supported by the record. The ALJ's credibility determination will be affirmed. Baker v. Barnhart, 457 F.3d 882, 893-894 (8th Cir. 2006) (affirming the ALJ's credibility decision where the claimant's FCE was invalid due to symptom magnification, the claimant chose not to take pain medication, and the numerous medical opinions of record agreed that the claimant's reports of pain were inconsistent with his physical condition).

2.      The ALJ's RFC Finding.

After assessing Salih's credibility, the ALJ concluded:

> [W]hen provided the opportunity of normal breaks in the mid-morning, lunch time and mid-afternoon, [Salih] the residual functional capacity to: lift twenty pounds occasionally and ten pounds frequently: stand for six hours of an eight hour workday: sit for six hours of an eight hour workday: and walk on a frequent basis. He is limited to performing only occasional activities of bending, stooping or kneeling. He must not be exposed to concentrated cold temperature extremes or wetness. He has no limitations with regards to the use of his extremities, performing overhead reaching or the ability to climb stairs.

(TR 22).

In evaluating a claimant's RFC, the ALJ is not limited to considering medical evidence, but is required to consider at least some supporting evidence from a professional. See 20 C.F.R. § 404.1545(c) ; Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir. 2003) ; Masterson v. Barnhart, 363 F.3d 731, 737-38 (8th Cir. 2004).  In formulating his RFC opinion, the ALJ relied on his credibility determination, the plaintiff's medical records, and physical RFC findings provided by Dr. Reed, Dr. Knosp, and Dr. Green, each of whom formulated their opinions based on reviewing the plaintiff's medical records and, in Dr. Green's case, examining the plaintiff.  The ALJ's RFC assessment mirrors the restrictions set forth in Dr. Reed's report, which was affirmed by Dr. Knosp, and further supported by Dr. Green.  The ALJ's RFC finding is fully supported by the record.

B.      The VE's Opinions.

The VE opined that Salih remained able to perform his past relevant work as a production assembler (light, unskilled, SVP 2, DOT 706.687-010) and as a cashier II

(light, unskilled, SVP 2, DOT 211.462-010).   In reliance on this opinion, the ALJ concluded Salih was not disabled and denied his disability claim.

Salih argues the ALJ failed to properly consider his actual past relevant work and erroneously concluded Salih could return to that work. The plaintiff bears the burden of proving he cannot perform his past relevant work.   King v. Astrue, 564 F.3d 978, 979 (8th Cir. 2009); Samons v. Astrue, 497 F.3d 813, 821 (8th Cir. 2007).

The ALJ's opinion states Salih's past relevant work include the occupations of production assembler (light, unskilled, SVP 2, DOT 706.687-010) and cashier II (light, unskilled, SVP 2, DOT 211.462-010).   The opinion states Salih remains able to perform those jobs as they are actually and generally performed.   At step four, the ALJ "must also make explicit findings regarding the actual physical and mental demands of the claimant's past work, . . . but may discharge this duty by referring to the specific job descriptions in the Dictionary of Occupational Titles that are associated with the claimant's past work."   Pfitzner v. Apfel, 169 F.3d 566, 569 (8th Cir. 1999).

Salih claims, however, that as described during his testimony, the DOT descriptions of a Cashier II and a production assembler (light, unskilled) do not include all the tasks he was required to perform when employed in those positions.   Specifically, he claims that as a cashier, he was required to lift and carry propane tanks and products to fill the refrigerator; and as a production assembler, he was required to bend, reach, lift and carry beyond his current abilities.   Salih argues that the actual requirements of his past relevant work were erroneously ignored by the ALJ and exceed his RFC as determined by the ALJ.

To the extent the plaintiff is arguing that the court must incorporate his testimony into the descriptions of his past jobs, as to each of those occupations, the plaintiff was asked to confirm that his prior written descriptions of the jobs in SSA documentation

were correct.  He testified that they were.  The ALJ was entitled to rely on that testimony as an accurate description of the plaintiff's work.  The plaintiff argues that he was confused because the SSA documents and the ALJ proceedings were conducted in English, which is not his primary language.  But there are references throughout the SSA records and in the medical records confirming that Salih reads, writes, speaks and understands English.  And the testimony before the ALJ—particularly when Salih was explaining his dissatisfaction with the type and quality of his medical care—exhibits a substantial command of the English language.  The ALJ did not error in relying on the plaintiff's written submissions, and his testimonial confirmation of those submissions, in determining the nature of Salih's past relevant work.

The plaintiff may be arguing that the DOT descriptions of his past employment are incorrect because they do not include all the tasks he actually performed.  To the extent he is claiming the DOT is an unreliable source for identifying occupations and their related requirements, his argument fails.  "The DOT is a primary source 'of reliable job information' that is used routinely by the Commissioner when determining whether suitable jobs exist in the regional economy."  Olatubosun v. Astrue, case no. 8:09cv376, 2010 WL 3724819 at *14 (D.Neb. Sept. 17, 2010) (Smith Camp, J., presiding) (citing 20 C.F.R. § 404.1566(d)).  The ALJ did not error by relying on the DOT in determining Salih's ability to perform past relevant work.

Finally, citing his hearing testimony which added tasks not identified in his written descriptions of his past employment, the plaintiff argues his past relevant work required lifting and bending beyond his current abilities as determined by the ALJ.  However, a VE can consider the demands of the claimant's past relevant work either as the claimant actually performed it or as it is performed in the national economy.  Wright v. Astrue, case no. 12-1198, 2012 WL 4840766 at *1 (8th Cir. Oct. 12, 2012).  "The mere inability of a claimant to perform certain requirements of his past job does not

21

mean that he is unable to perform 'past relevant work' as that phrase is used in the regulations." Leggett v. Chater, 67 F.3d 558, 564 (5th Cir. 1995).

Salih had the burden of proving that he was unable to return to his past relevant work; if he remains able to perform any of his past relevant jobs, he is not disabled. The ALJ determined Salih's RFC, and that determination is supported by the evidence of record. Relying on the testimony of the VE, the ALJ concluded Salih's past relevant work included the occupations of Cashier II and a light duty production assembler, and that upon consideration of the plaintiff's residual RFC, the plaintiff could return to those positions as they are generally performed in the national economy. The record supports this finding.

Accordingly,

IT IS ORDERED that the findings and conclusions of the ALJ are affirmed.

Dated this 5th day of February, 2013.

BY THE COURT:

*s/ Cheryl R. Zwart*
United States Magistrate Judge

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.